**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GLORIA BEARD, | ) | CASE NO. 1:18cv02500 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Gloria Beard ("Plaintiff" or "Beard"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a

Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security

Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and

1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of

the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is **AFFIRMED.**

## I.    PROCEDURAL HISTORY

In November 2015, Beard filed applications for POD, DIB, and SSI, alleging a disability

onset date of January 1, 2015 and claiming she was disabled due to hepatitis C, back problems,

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

bronchitis, liver problems, heart problems, thyroid problems, kidney problems, high blood pressure, depression, and mental health issues. (Transcript ("Tr.") at 348.) The applications were denied initially and upon reconsideration, and Beard requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 20.)

On October 5, 2017, an ALJ held a hearing, during which Beard, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 20.) On February 14, 2018, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 20-42.) The ALJ's decision became final on August 28, 2018, when the Appeals Council declined further review. (*Id.* at 1-4.)

On October 30, 2018, Beard filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13 & 16.) Beard asserts the following assignments of error:

(1)     The ALJ did not properly evaluate and assign appropriate weight to the findings and opinions of Nurse Alaimo, Beard's mental healthcare provider.

(2)     The ALJ's finding that Beard does not require an opportunity to alternate positions between sitting and standing is not supported by substantial evidence.

(Doc. No. 13 at 1).

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Beard was born in November 1968 and was 49 years old at the time of her hearing, making her a "younger" individual under Social Security regulations. (Tr. 41.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She has a limited education and is able to communicate in English. (Tr. 41.) She has past relevant work as a Nurse Assistant, Child Attendant, and Server. (*Id.* at 40.)

**B.       Relevant Medical Evidence[2]**

**1.       Mental Impairments**

On February 10, 2014, Beard met with Ellen Alaimo,[3] an advanced practice nurse at Murtis Taylor Human Services.  (Tr. 518.)  Nurse Alaimo's notes show Beard had previously been diagnosed with post-traumatic stress disorder ("PTSD") and major depressive disorder, recurrent.  (*Id*.)  She presented at that visit with some delusional ideas, and she complained of nightmares related to the recent deaths of two family members.  (*Id.*)

On April 10, 2014, Beard met with Nurse Alaimo again.  (*Id.* at 520.)  Treatment notes describe her as presenting with bipolar disorder, being "[s]ometimes paranoid and reluctant to leave the house," and startling easily.  (*Id*.)

 On September 24, 2014, Beard had a medication management appointment with Nurse Alaimo, who noted she was "always anxious about day to day problems."  (*Id.* at 522.)

On November 19, 2014, Nurse Alaimo noted that Beard was kept up at night thinking about her brother, who had died two weeks earlier, and imagining her own death. (*Id.* at 526.)  Beard reported hearing voices "off and on," but stated, "it's not bad."  (*Id*.)

On January 14, 2015, Nurse Alaimo noted that Beard presented with "recurrent depression and probable schizotypal disorder." (*Id.* at 545.)  She described Beard's mood as "brighter today," and noted she had a new boyfriend.  (*Id*.)  She noted that, in the past, Beard had "complained of

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] Plaintiff's Brief identifies this provider as "Elaine Alaimo," but the treatment notes record her name as "Ellen Alaimo."  (Doc. No 13 at 4; Tr. 518-26.)

voices and felt she was clairvoyant," and that she "still has frequent depression and is very sensitive to insults and stress." (*Id.* at 546.)

Beard did not return to Murtis Taylor until August 21, 2015, and Nurse Alaimo noted that she had been noncompliant with appointments during the intervening time. (*Id.* at 529.) Beard's medical records show a new diagnosis of schizotypal personality disorder. (*Id*.) Treatment notes describe Beard as presenting with "recurrent depression and schizotypal traits," not sleeping, and feeling overwhelmed and depressed, with no energy or motivation. (*Id*.)

On December 8, 2015, Nurse Alaimo noted Beard's major depressive disorder was in remission. (*Id.* at 551.) She noted that Beard had again been noncompliant with follow-up appointments, and as a result, she had run out of medication. (*Id.* at 552.) Beard reported "intense frequent nightmares," as well as panic, depression, and "thoughts of worthlessness and guilt." (*Id.* at 553.) She also reported hallucinations of dogs chasing her, and was rejecting visits from her family. (*Id*.)

On February 17, 2016, Michael Faust, Ph.D., a clinical psychologist, evaluated Beard at the request of Social Security. (*Id.* at 1034.) In preparing his opinion, he also reviewed her treatment records from Murtis Taylor and MetroHealth. (*Id*.) He noted that she was punctual for her appointment and presented a "good appearance." (*Id*. at 1034, 1307.) She was cooperative with all his questioning, but "showed some difficulty in tracking the conversation and was anxious and agitated throughout the examination." (*Id*. at 1037.) He described her as "rather odd in presentation with limited social skills." (*Id*.) He diagnosed her with bipolar II disorder, PTSD, schizotypal personality disorder, and alcohol and cocaine use disorder in 30-year remission. (*Id.* at 1039.) He described her cognitive skills as "low average range," and found no limitations "with regard to

4

attention, concentration, persistence or work pace," but noted "she may exhibit more difficulty with her attention and persistence as her psychological stress increases." (*Id.* at 1040.) He opined that she would be limited in her ability to respond appropriately to supervision, coworkers, and work pressures in an employment setting due to symptoms associated with PTSD, schizotypal personality disorder, and bipolar II disorder. (*Id.* at 1040-41.)

On April 15, 2016, Beard returned to Murtis Taylor and was seen by Nurse Christian Okoko and Nurse Alaimo. (*Id.* at 1286.) They reported Beard's "mood has been up and down but that her medication has been helping her calm down and focus." (*Id.* at 1288.) They observed that her mood was "bright when she came in but [she] started crying as the interview progressed." (*Id.*)

On June 24, 2016, Nurse Alaimo reported Beard was anxious due to economic hardship and stress because "everybody depends on me." (*Id.* at 1282.) She reported being "paranoid when she goes out," hearing "some voices infrequently (reports about 4 times a month)," and having thoughts of suicide by taking pills. (*Id.*)

On September 22, 2016, Courtney Preto, a therapist at Murtis Taylor, conducted a psycho-social assessment of Beard. (*Id.* at 1300-06.) She opined that Beard demonstrated "moderate" mental stability, thought content, and perception, but in the past had reported delusional thinking, paranoia, and auditory hallucinations. (*Id.* at 1302, 1304-05.) Her diagnosis was adjusted to major depressive disorder, recurrent, severe with psychotic features, and her services were unchanged. (*Id.* at 1303.)

On October 20, 2016, Nurse Alaimo reported Beard had been off her medication about a month and "wasn't sure it worked very well." (*Id.* at 1354.) She was reporting more hallucinations than before - besides hearing voices, she now smelled cologne in her house - and her dreams were

5

vivid enough to wake her, shaking and anxious.  (*Id.* at 1353.) She reported feeling depressed and

angry, and said she had thought about suicide by overdose "a month ago."  (*Id.*)  Nurse Alaimo

prescribed a new medication, Rexulti.  (*Id.* at 1354.)

On the same day, Nurse Alaimo completed an assessment of Beard's mental capacity for use

in her Social Security application.  (*Id.* at 1348-49.)  She opined that Beard could rarely:[4]

- deal with work stress;

- complete a normal workday and workweek without interruption from psychologically-based symptoms; and

- perform at a consistent pace without an unreasonable number and length of rest periods.

(*Id.* at 1348.)  She opined that Beard could occasionally:[5]

- follow work rules;

- use judgment;

- maintain attention and concentration for extended periods of 2-hour segments;

- respond appropriately to changes in routine settings;

- deal with the public;

- relate to co-workers;

- interact with supervisor(s);

- function independently without redirection;

- work in coordination or proximity to others without being distracted;

---

[4]  On this form, "rare" is defined as "cannot be performed for any appreciable time."
(Tr. at 1348.)

[5]  On this form, "occasional" is defined as "ability for activity exists for up to 1/3 of work
day."  (*Id.*)

- work in coordination or proximity to others without being distracting;

- understand, remember, and carry out complex job instructions;

- understand, remember, and carry out detailed, but not complex, job instructions;

- socialize;

- behave in an emotionally stable manner; and

- relate predictably in social situations.

(*Id.* at 1348-49.)  She based this assessment on Beard's history of major depressive disorder and PTSD, and her consistent reports of hearing voices, having premonitions and concrete thinking.  (*Id.* at 1349.)

On February 8, 2018, Nurse Alaimo noted that Beard had not come for her scheduled visits since October 2017, and her medication had again run out.  (*Id.* at 1373.)  She reported "more mood swings ranging from irritability, arguing, depression, and normal moods during the day," fear of sleeping in her own room, auditory and visual hallucinations, and "a lot of thoughts about death and premonitions."  (*Id.*)  Nurse Alaimo restarted her on Rexulti.  (*Id.*)

On March 31, 2017, Nurse Alaimo noted that Beard reported no hallucinations, delusions or suicidal ideation, but did report "a dissociative like feeling when she is with people or doing something," and feeling "out of balance."  (*Id.* at 1363.)  Nurse Alaimo suggested increasing her dosage of Rexulti.  (*Id.* at 1364.)

## 2. Physical Impairments

On February 20, 2014, Beard went to Metro Health for physical therapy to treat her low back pain.  (*Id.* at 823.)  She reported intermittent pain as high as 8 on a 10-point pain scale, but told the physical therapist her pain dropped to 0 on the scale with rest and medication.  (*Id.* at 826.)  She had

previously been getting monthly injections for her pain, but had not gotten one for the past four months. (*Id.*) The physical therapist noted Beard had decreased trunk range of motion with pain at end ranges, decreased bilateral lower extremity strength, decreased overall endurance, poor body mechanics, and increased pain. (*Id.* at 827.)

On April 23, 2014, Beard went to MetroHealth with worsening pain in her back and left foot. (*Id.* at 638.) She reported that she had stopped going to her physical therapy appointments because her pain was worse after therapy. (*Id.*) She was given an injection in her left heel to treat pain from plantar fascitis, and asked to resume injections to treat her back pain. (*Id*.) The notes state she would "be scheduled for a L3-5 [medical branch block] in the near future" to further treat her back pain. (*Id.*)

On July 14, 2014, a CT scan of Beard's abdomen and pelvis was performed at Lutheran Hospital. (*Id.* at 583.) It showed lower lumbar discogenic disease and acquired spinal canal narrowing. (*Id*.)

On November 20, 2014, Beard visited the MetroHealth Department of Rheumatology for treatment of left thigh pain and numbness. (*Id.* at 771.) She also reported low back pain. (*Id.*) Dr. Sherilyn Diomampo believed the pain was caused by retrolisthesis of the lumbar spine and osteoarthritis, and she increased Beard's dosage of Gabapentin, recommended exercise, and referred her for pain management. (*Id.* at 775.)

On September 8, 2015, Beard went to the Lutheran Hospital Emergency Department for treatment of sharp, achy, tingly low back pain and numbness and pain in her left leg. (*Id.* at 507.) The doctor observed she had decreased range of motion and tenderness in her lower back and left hip, and discharged her with medication. (*Id.* at 509.)

Om September 23, 2015, Beard was seen at MetroHealth for treatment of a hypothyroidism which had caused a large, multi-nodular goiter.  (*Id.* at 737.)  Pharmaceutical management of her hypothyroidism was complicated by the fact that Beard "insists that the [medication] makes her phlegm thick so she skips a pill now and then so that the phlegm will become thin."  (*Id.*)

On October 7, 2015, Beard was treated at MetroHealth for worsening lumbar back pain, which she described as "dull, intermittent and chronic."  (*Id.* at 605.)  Treatment notes indicate she was given a Left L3, L4, and L5 lumbar medial branch block at her last visit in May 2015, but only experienced symptom relief for two weeks.  (*Id.*)  Her pain assessment noted that she was positive for depression, and currently experiencing pain ranging from 6 to 10 on a 10-point scale.  (*Id.*)

On November 19, 2015, she was treated at MetroHealth's Liver Clinic for hepatitis C.  (*Id.* at 720.)  Treatment records document a 2001 liver biopsy had shown her to be at stage 1, grade 2, with minimal portal fibrosis.  (*Id.* at 724.)  A 2012 ultrasound of her liver showed normal findings. (*Id.*)

On December 21, 2015, Beard was evaluated for physical therapy to treat her low back pain. (*Id.* at 556.)  The therapist noted Beard had poor posture and moderate limitations in her lumbar range of motion.  (*Id.* at 558.)  Beard described "intermittent, unchanging low back pain," and was not experiencing leg pain at that visit.  (*Id.* at 559.)  She expressed eagerness to learn new exercises, but stated "she never kept up with aquatic exercises which had made her feel better."  (*Id.*)

On January 11, 2016, doctors at MetroHealth's Liver Clinic sought to treat her hepatitis C with 12 weeks of DAA therapy with Harvoni.  (*Id.* at 868.)[6]

---

[6] Notes from September 13, 2016, state that this treatment was denied by insurance. (Tr. 1330.)

Treatment notes from February and September 2016 show Beard was clinically stable on thyroid medication. (*Id.* at 1260, 1338.)

On October 4, 2016, Beard received treatment for her osteoarthritis at the MetroHealth Department of Rheumatology. (*Id.* at 1315.) Stanley Ballou, M.D., noted that she reported increased back pain, urinary incontinence, and "some symptoms that could be consistent with lumbar spine stenosis." (*Id.* at 1315.) He adjusted her medication and recommended she resume water exercise. (*Id.*) X-rays ordered by Dr. Ballou showed thoracolumbar dextroscoliosis with a rotary component; degenerative changes of the lumbar spine; disc space narrowing between the L3, L4, L5 and S1 vertebrae with marginal osteophytes; and some retrolisthesis of L3 and L4. (*Id.* at 1326.)

On November 3, 2016, Beard went to the MetroHealth Pain Management Clinic for a disability examination conducted by Nurse Ann Harrington. (*Id.* at 1381.) Her physical examination showed a mildly limited range of motion in Beard's hip and trunk. (*Id.* at 1387.) Nurse Harrington opined that Beard could easily lift 11 pounds and could lift a maximum of 21 pounds. (*Id.*) Beard reported that she could sit for 20 minutes and stand or walk for 30 minutes. (*Id.*) Nurse Harrington's Medical Source Statement stated Beard's ability to lift, carry, stand, walk, and sit were not affected by her impairment, but she needed to be able to alternate positions at will. (*Id.* at 1618-19.) She opined that Beard could occasionally climb, balance, stoop, crouch, kneel, or crawl. (*Id.* at 1618.) She noted that Beard experienced pain, but the intensity of this pain was "subjective." (*Id.* at 1619.)

On November 30, 2016, Beard returned to the MetroHealth Pain Management Clinic for treatment of her "dull and intermittent" back pain. (*Id.* at 1411.) She reported that the pain worsened with sitting, walking, and movement, but that her medications improved her ability to perform activities of daily living and reduced her pain, without adverse side effects. (*Id.*)

On January 5, 2017, Beard's plantar fascitis was again treated at MetroHealth. (*Id.* at 1460.) Angela Grady, M.D., noted that when Beard stood after sitting, she limped because it was too painful for her to put weight on her heels. (*Id.*) Beard received treatment of her thick, painful toenails and was given heel injections. (*Id.* at 1463.)

On January 12, 2017, Beard cancelled a scheduled MRI due to fear, but promised to reschedule it.[7] (*Id.* at 1477.)

On April 24, 2017, Beard saw Kathleen Quealy, M.D., a MetroHealth cardiologist. (*Id.* at 1541.) Dr. Qualy noted that she was not taking her medication as prescribed and advised her that she was "NOT disabled from a heart standpoint." (*Id.* at 1543, emphasis in original.)

On April 26, 2017, Beard had a follow-up appointment with the MetroHealth Pain Management Clinic. (*Id.* at 1548.) She described her pain as "sharp and continuous," but controlled by her medication. (*Id.*) Her medication was refilled and she was referred for physical therapy. (*Id.* at 1552.)

On May 4, 2017, Beard restarted physical therapy. (*Id.* at 1548.) The physical therapist noted Beard had a "poor slouched sitting posture" and also poor standing posture. (*Id.* at 1562.) On examination, she had pain with all lumbar movement, and shortened hip flexors and quads. (*Id.* at 1563.) She showed improved movement patterns after attending three physical therapy sessions in May and June 2017. (*Id.* at 1569.)

---

[7] When Beard tried to reschedule the MRI, it needed to be reordered. (Tr. 1493.) Next, it was delayed because insurance required she do physical therapy first. (*Id.* at 1548.) It was reordered on March 14, 2017. (*Id.* at 1526.)

On May 5, 2017, Beard returned to her cardiologist, Dr. Qualey. (*Id.* at 1569.) Dr. Qualey opined she had hypertensive heart disease with atrial arrhythmia, likely related to obstructive sleep apnea, but was not disabled from a heart standpoint. (*Id.* at 1570.)

## C.    State Agency Reports

### 1.    Mental Impairments

On May 7, 2016, Kathleen Malloy, Ph.D., a State Agency reviewing psychologist, opined that Beard was limited to simple, routine four-to-five step tasks; her concentration would be limited if she experienced stress that exacerbated her emotional symptoms; and she was markedly limited in interacting with the general public, but capable of limited, superficial social interactions. (*Id.* at 261-62.) She opined that Beard should avoid crowds and required a setting in which her duties were routine and predictable, and where changes could be explained and introduced slowly. (*Id.*)

On May 12, 2016, State Agency reviewing psychologist Carl Tishler, Ph.D., concurred with Dr. Malloy's opinion. (*Id.* at 295-98.)

### 2.    Physical Impairments

On May 7, 2016, State Agency reviewing physician Gerald Klyop, M.D., opined that Beard could lift, carry, or pull 20 pounds occasionally and 10 pounds frequently; could stand and/or walk and sit with normal breaks about 6 hours in an 8-hour workday; had a limited ability to push and pull in both her upper and lower extremities; could climb ramps and stairs frequently and climb ladders, ropes, or scaffolds occasionally; could stoop, kneel, crouch, and crawl occasionally; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.* at 259-261.)

On May 13, 2016, State Agency reviewing physician Esberdado Villanueva, M.D. concurred with Dr. Klyop's opinion. (*Id.* at 294-95.)

**D.**    **Hearing Testimony**

During the October 5, 2017 hearing, Beard testified to the following:

- She is 49 years old, 5 feet 10 inches tall, and weighs roughly 258 pounds.  (Tr. 61.)

- She drove to the hearing.  She was 25 minutes late because she had been unaware that it was happening on that day.  She was dropping someone off and got a call from her lawyer asking whether she would attend.  She then rushed over to the hearing.  (*Id.* at 60-61.)

- She could not recall ever having spoken to her lawyer before.  (*Id.* at 62.)

- Since the onset of her disability, she has made no more than $25 a week driving people to places like doctors' appointments and stores.  She does not get this work through a company, and does it "probably like once a month."  (*Id.* at 63.)

- She believes she is disabled because "when my anxiety kick [sic] in, it makes me like nervous and scared of being in a crowd or around people, and from me being under a lot of medication and different things . . . my body reacts . . . sometimes I just feel overwhelmed, I guess, then my back . . . I have like a    like my spine is . . . crooked and then I have arthritis up in there and then it's a lot of swelling up in my back, so . . . I can sit for so long and then I have to stand . . . most jobs you have to do a lot of standing and that    it irritates my back to the point where I can barely walk." (*Id.* at 64.)

- Her bipolar condition sometimes makes her lash out at people, get angry at people, or fear someone will hurt her, so she becomes scared to leave her house.  (*Id.*)

- She is "not sure what is going to happen" to her because of her bipolar condition and other health problems, including heart disease, a kidney blockage, bronchitis, thyroid disorder, liver disorder, stomach problems, and her mental problems.  (*Id.* at 64-65.)

- Side effects from her medications include: "I get shakes and some of them make me nervous."  (*Id.* at 66.)

- She has had an MRI on her back and will have another one.  The doctor told her she can treat her back pain with either steroid injections into her spine or surgery.  She is worried that the needle used to inject the steroids might paralyze her, so she "might do the surgery."  (*Id.*)

13

- Over the past couple of years, her back has gotten a lot worse. She hurts more, and her left leg is numb to the touch. She went to the Emergency Department at Lutheran Hospital "a couple of times" because of her leg, but they "kept sending me home and telling me that it's part of the back issue." She has also gone to the Emergency Department frequently for "real bad" pain in her back. They give her more pain medication. (*Id.* at 66-68.)

- She gets treatment for her medical problems at MetroHealth on West 150th Street. (*Id.* at 69.)

- She is still taking Tramadol and Meloxicam. (*Id.* at 70.)

- She can sit about 15 or 20 minutes before she needs to stand up or change position, and stand for about 15 or 20 minutes before she needs to sit down. (*Id.* at 71.)

- When she walks, it hurts. She hasn't timed how long she can walk, but when she grocery shops she needs to lean on a cart to get through the store. (*Id.* at 71-72.)

- Around the house, she washes dishes and cleans up, straightening the beds, for example, but doesn't push furniture or do any lifting. She has 17-year-old and 11-year-old children living with her who help with those tasks. (*Id.* at 72.)

- She can lift a gallon of milk, but would have one of her children lift a 10-pound sack of potatoes, because it would hurt. (*Id.* at 72-73.)

- Her behavioral health doctor gave her pills to help her sleep at night because she doesn't sleep. Sometimes the pills help, and other times she has too much on her mind. (*Id.* at 73.)

- She feels helpless and worthless because of "all the medications I'm on and all the health problems I have . . . with the kids and then just with the bills." She feels overwhelmed. (*Id.*)

- Leaving the house and being around people makes her anxious. She feels like someone is out to get her, but her behavioral health doctor tells her she is over-thinking things. (*Id.* at 74.)

- When she gets anxious, her heart starts racing and to calm herself down she will call a family member to talk. (*Id.*)

- When her bipolar symptoms kick in, she "want[s] to cry and . . . punch things or hit stuff or . . . do bad things to people but I know I can't." (*Id.*)

- She struggles with anxiety and bipolar symptoms "on a daily basis," but she is learning to control them by finding someone to talk to or waiting for them to pass. Sometimes she goes to the Emergency Department because she thinks she is having a heart attack, but it is just her anxiety. (*Id.* at 75.)

- She has been seeing Nurse Alaimo for six, seven, or eight years. She usually sees her once every three months, but when she's feeling overwhelmed, she goes once a month. (*Id.*)

- She is seeing her more often right now because her previous medication was making her sweat and "it was still making me hear things and stuff," so she was switched back to her previous medication, Latuda, which seems to be working. (*Id.* at 75-76.)

- She last had physical therapy for her back about a month ago. She finds physical therapy "hurts me better than it helps me." (*Id.* at 76.)

- She sometimes skips physical therapy appointments and does not do the prescribed exercises because they cause her so much pain. (*Id.* at 77.)

- She feels it is unfair that other people receive disability benefits easily, and she has to keep fighting to get benefits for her ongoing problems. (*Id.* at 78.)

The VE testified Beard had past work as a Nurse Assistant, Child Attendant, and Server.

(*Id.* at 55-56.) The ALJ then posed the following hypothetical question:

Imagine a person having Beard's age, education and vocational background. The person is able to perform work at the light exertional level; frequently push or pull and operate foot pedals; frequently climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; constantly balance; occasionally stoop, kneel, crouch or crawl. The person must avoid concentrated exposure to smoke, fumes, dusts, gases, and poor ventilation. The person can occasionally be around dangerous machinery and unprotective [sic] heights. The person is able to perform simple, routine four-to-five step tasks; and is limited to superficial social interactions with others, meaning the job cannot require arbitration, negotiation, conflict resolution, management or supervision of others, or being responsible for the health, welfare or safety of others. She'd work best in an environment that allows her to avoid crowds. That person can adapt to a setting where duties are routine and predictable and where changes are explained and introduced slowly. The person has the ability to concentrate and persist to complete those tasks. Could that hypothetical person perform any of beard's past work or any other work in the national economy?

The VE testified the hypothetical individual would not be able to perform Beard's past work as a nurse assistant, child attendant, or server. (*Id.* at 57.) He further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as marker labeler, assembler, or laundry bagger, light. (*Id.*)

The ALJ asked whether it would be problematic to sustaining the jobs the VE mentioned if the hypothetical person was going to be off-task for any reason. (*Id.* at 57-58.) The VE replied that, in his professional experience, most jobs permitted employees to be off-task up to and including 10% of their workday, but anything more than that would preclude work. (*Id.* at 58.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of*

*Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Beard was insured on her alleged disability onset date, January 1, 2015, and remains insured through December 31, 2019, her date last insured ("DLI.") (Tr. 23.) Therefore, in order to be entitled to POD and DIB, Beard must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

17

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.917 *et seq.*)

3.  The claimant has the following severe impairments: disc displacement of the lumbar spine, retrolisthesis, lumbar facet arthropathy, lumbar radiculopathy, degenerative disc disease of the lumbar spine, thyroid disorder, status post thyroidectomy, chronic hepatitis C, major depressive disorder/bipolar II disorder, anxiety disorder, posttraumatic stress disorder (PTSD), and schizotypal personality disorder. (20 CFR 404.15209(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can frequently push or pull, and frequently operate foot pedals.  She can frequently climb ramps and stairs and occasionally climb ladders, ropes or scaffolds.  The claimant can constantly balance, but only occasionally stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to smoke, fumes, dusts, gases and poor ventilation.  She can occasionally be around dangerous machinery and unprotected heights.  The claimant is able to perform simple, routine 4-5 step tasks.  The claimant is limited to superficial social interactions with others, with superficial meaning the job cannot require arbitration, negotiation, conflict resolutions, management or supervision of others, or being responsible for the health, safety or welfare of others.  The claimant would work best in an environment that allows her to avoid crowds.  The claimant can adapt to a setting where duties and routines are predictable, and where changes are explained and introduced slowly.  She has the ability to concentrate and persist to complete those tasks.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November **, 1968 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 CFR 404.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-42.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord

*Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.

Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No.

1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First assignment of error: The findings and opinions of Nurse Alaimo, Beard's mental
healthcare provider**

Beard first argues that the ALJ did not use appropriate standards to adequately evaluate the

opinion of Nurse Ellen Alaimo, Beard's treating psychiatric nurse practitioner, and, as a result,

adopted a determination of residual functional capacity that is both premised on legal error and not

based on substantial evidence.  (Doc. No. 13 at 13-14.)  Beard asserts the ALJ violated Social

Security Ruling 6-03p by giving Nurse Alaimo's opinion only "some weight" because she is not a

psychiatrist or psychologist.  (*Id.* at 15.)  She also argues the ALJ was factually incorrect in finding

that Nurse Alaimo's opinion that Beard could rarely deal with work stress or complete a normal

work-day or work-week lacked sufficient objective support in the record.  (*Id.* at 16.)[8]

---

[8]  At the end of this section of her brief, Beard references the additional argument that the
ALJ's failure to adequately explain his decision not to rely on the opinion of consultative
examiner Michael Faust, Ph.D., is also reversible error.  Since this argument is not
developed in the brief, it will not be discussed here. *See McPherson v. Kelsey*, 125 F.3d
989, 995  96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived. It is not
sufficient for a party to mention a possible argument in the most skeletal way, leaving the
court to . . . put flesh on its bones.")

The Commissioner responds that substantial evidence supports the ALJ's decision. He asserts that the ALJ carefully considered all of the record evidence, in a manner consistent with agency rulings and regulations, in making his determination. (Doc. No. 16 at 7.) He points out that the ALJ gave "some weight" to Nurse Alaimo's opinion, but chose not to give it controlling weight after a careful evaluation that was explained in his opinion. (*Id.* at 12.)

It is well-established a nurse practitioner is classified as an "other source" under the Commissioner's regulations. *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248 (6th Cir. 2015) ("'Other sources' is everyone else, including nurse practitioners."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Therefore, the opinion of a nurse practitioner is not subject to the "good reasons" requirement of the treating physician rule. *See* 20 CFR §§ 416.902(a)(1) -(8), 416.927(a)(1), 416.927(f); *Noto*, 632 F. App'x at 248. Nonetheless, Social Security Ruling 06 03p[9] notes that information from "other sources" such as nurse practitioners "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06 03p, 2006 WL 2329939 at *2 3 (Aug. 9, 2006). *See also* 20 CFR § 416.927(c). Under the Sixth Circuit's interpretation of this SSR, opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse,* 502 F.3d at 541. *See also McKitrick v. Comm'r of Soc. Sec.*, No. 5:10 CV 2623, 2011 WL 6939330, at *12 13 (N.D. Ohio

---

[9] SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. *See* "Rescission of SSRs 96-2p, 96-5p, and 06-3p," 2017 WL 3928298 at * 2 (SSA March 27, 2017). Here, Beard filed her applications in November 2015, prior to the rescission of SSR 06-03p.

Dec. 30, 2011); *Kerlin v. Astrue*, No. 3:09cv00173, 2010 WL 3937423, at *7 (S.D. Ohio March 25, 2010). *See also* 20 CFR § 416.927(c),(f). Yet the ALJ has broad deference in his final determination; "[t]he opinion of a "non-acceptable medical source" is not entitled to any particular weight or deference    the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto*, 632 F. App'x at 248 49 (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); *Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 397 98 (6th Cir. 2014)).

Beard focuses on the ALJ's assertion that because Nurse Alaimo is not licensed psychiatrist or psychologist, she is not an "acceptable medical source" as defined by the Social Security Rulings and therefore, "her opinion *cannot* be given controlling weight." (Tr. 38, emphasis added.) She argues that this is a misstatement of the law, because under SSR 6-03p the ALJ *could* give controlling weight to Nurse Alaimo's opinion if he chose to do so. (Doc. No. 13 at 14-16.)

However, in his opinion, the ALJ made it clear that he does not believe Nurse Alaimo's opinion is entitled to more than "some weight," for reasons having nothing to do with her medical credentials, so the alleged mistake of law would not change the outcome here.[10] The ALJ followed the analytical framework set forth by the Social Security Rulings. He gave consideration to the fact that Nurse Alaimo "has an extensive treating relationship with the claimant." (Tr. 38.) He explained his reasoning regarding Nurse Alaimo's opinion in a clear and coherent manner, basing it on a lack

---

[10] The Court need not remand where doing so is futile. *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) ("To remand would be an idle and useless formality. *Chenery* does not require that we convert judicial review of agency action into a ping-pong game . . . There is not the slightest uncertainty as to the outcome of a proceeding before the Board . . . It would be meaningless to remand."); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citing and quoting *Wyman-Gordon Co.*, 394 U.S. at 766 n.6).

23

of objective support in the record and citing specific record evidence he found inconsistent with her opinion. (*Id.* at 38-39.) Beard implicitly acknowledges that the ALJ identified the evidence he relied on in her next argument: that the evidence the ALJ relied on is factually incorrect. (Doc. No. 13 at 16.)

Beard next objects that "[t]he ALJ's additional finding that Nurse Alaimo's opinion is not supported by the objective evidence of record, is also factually incorrect." (Doc. No. 13 at 16.) This misstates the ALJ's ruling, which found only a small portion of Nurse Alaimo's opinion — "a finding that claimant can rarely deal with work stress or complete a normal workday or workweek" — to be without sufficient objective support in the record. (Tr. 39.) The ALJ based this determination on the treatment reports showing "evidence of generally cooperative behavior and linear, logical thought processes on examination," and on Beard's activities of daily living, noting that she regularly attends medical appointments, shops in stores, drives independently, and cares for her daughter and granddaughter, both of whom have special needs. (*Id.*) The ALJ cited to specific evidence in the record to support these findings. (*Id.*)

In response, Beard cites case law for the undisputed proposition that the ALJ is required to consider the treatment records of mental health providers. (Doc. No. 13 at 16-17.) As discussed above, the ALJ considered Nurse Alaimo's treatment records, gave weight to many parts of her opinion, and disagreed with one of her conclusions. Beard adds one sentence relating her argument to the evidence in this case: "Here, the treatment notes and observations by Nurse Alaimo provide an objectively based mental health diagnosis based off of multiple depressive symptoms reviewed in clinical interviews and further observed Plaintiff cry and rock back and forth in her chair." (Doc. No. 13 at 17-18.) She follows this with a string citation to eight pages of the Transcript of

24

Proceedings before the Social Security Administration. (*Id.*) The ALJ adopted the diagnosis made by Nurse Alaimo and Beard's other mental healthcare providers: major depressive disorder/bipolar II disorder, anxiety disorder, PTSD and schizotypal personality disorder. (Tr. 23.) What is in dispute is the ALJ's assessment of the severity of Beard's symptoms, and it is not clear how the treatment records she cited support the "finding that claimant can rarely deal with work stress or complete a normal workday or workweek." Beard gives the Court no guidance as to why she thinks these eight pages are particularly significant.[11] The parties agree that Beard has significant mental health issues. The ALJ discussed many of the records Beard cites in his opinion. He balanced the evidence in the medical treatment notes with Beard's ability to control her symptoms under "relatively conservative mental health treatment," and to independently manage activities of daily living, including raising two children with special needs, which is inherently stressful. (*Id.* at 35, 39.) It is not for the Court to re-weigh that evidence.

Next, Beard asserts that consultative examiner Dr. Michael Faust's opinion "supports Ms. Alaimo's conclusions regarding stress intolerance and an inability to complete a normal workday or week, in that the consultant determined that Ms. Beard's significant mood issues and psychological dysfunction could impair her ability to understand, remember, and carry out tasks, that her ability

---

[11] Once record documents Beard's diagnosis and the medication prescribed. (Tr. 522.) As noted *infra*, the diagnosis is not in dispute. One record shows Beard crying as she discusses the death of her brother two weeks previously. (*Id.* at 526.) Another notes that her mood was "bright when she came in," but she cried as she discussed feeling overwhelmed by the responsibility of caring for her granddaughter and her teenager while also managing her own health problems. (*Id.* at 1288.) A third recounts that she was "tearful and had been talking about past trauma." (*Id.* at 1290.) Many describe her appearance as "casual, neat," or "clean, neat and appropriately dressed," her affect as "reasonable," and her speech as proceeding at a "normal rate and tone." (*Id.* at 526, 529 & 1288.) Two records describe "no restless movement," or zero "abnormal movements," while two others describe "mild rocking in chair." (*Id.* at 526, 552, 1290 & 1353.)

to maintain attention and concentration may decrease as her stress increases, that she would be limited in responding appropriately to supervisors and coworkers, and that she would have limitations in her ability to respond appropriately to work pressures." (Doc. No. 13 at 18.) Yet the ALJ concluded Beard had "moderate limitation" in most of these areas, including Beard's ability to handle stress. (Tr. 25-26.) This is entirely consistent with Dr. Faust's statement that "Ms. Beard is viewed to have limitations in her ability to respond appropriately to work pressures in an employment setting." (Tr. 1041.) Dr. Faust failed to specify the level of the limitations he documented in his opinion, and this failure to provide "specific functional limitations" is one of the reasons the ALJ gave his opinion only "some, but not great weight." (Tr. 39.)

In sum, none of the issues raised here provide sufficient grounds for remand. The Court finds the ALJ's analysis of Nurse Alaimo's opinion satisfies the regulatory requirements for considerations of opinions from "other sources," and is based on substantial evidence. Thus, the ALJ's decision to give Nurse Alaimo's opinion "some weight" is within the zone of choice, and must be affirmed.

**B.**     **Second assignment of error: The ALJ's finding that Beard does not require an opportunity to alternate positions between sitting and standing.**

Beard asserts that the ALJ's RFC determination that she can perform light work activity without requiring a sit/stand option lacks substantial evidence. (Doc. No. 13 at 19.) She accuses the ALJ of inappropriately "cherry picking," or selectively reading the evidentiary record and opinion of nurse practitioner Ann Harrington, in support of this determination. (*Id.*)

The Commissioner responds that substantial evidence supports the decision to give Nurse Harrington's opinion "little weight," and that the ALJ clearly explained those reasons as required

by the Social Security Rulings. (Doc. No. 16 at 15.) The Commissioner argues that the decision was based on multiple factors, including that Nurse Harrington was not an "acceptable medical source" under the regulations, was not one of Beard's treatment providers, and only performed a one-time disability examination of Beard. (*Id.*) In addition, the ALJ identified internal inconsistencies in Nurse Harrington's opinion. (*Id.* at 15-16.) He explained that the limitations which she proposed and he did not adopt were conclusory and contradicted by both those internal inconsistencies and other medical records. (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[12] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96 8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity

---

[12] This regulation has been superseded for claims filed on or after March 27, 2017. As Beard's application was filed in January 2015, this Court applies the rules and regulations in effect at that time.

determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96 8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

There is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points

to a disability finding.").

In this case, the ALJ's thorough discussion of why he did not credit the sit/stand limitation suggested in Nurse Harrington's opinion shows that the ALJ was not "cherry picking" the record: he acknowledged and analyzed evidence that would have supported a more restrictive RFC. He noted her examination found "tenderness to palpation of the lumbar spine and paraspinals and limited trunk and hip range of motion," but also noted "normal reflexes, sensation, strength, fine motor coordination and gate." (Tr. 37.) In fact, in her examination notes, Nurse Harrington recorded Beard's truck and hip range of motion as only "mildly limited." (*Id*. at 1387.) The only notes which clearly support the sit/stand limitation are Beard's self-reports. (*Id*.)

It is impossible to determine Nurse Harrington's rationale, however, because her disputed opinion is expressed as a check mark in the "yes" box following the question "Does the individual need to be able to alternate positions between sitting, standing, and walking, at will?" (Tr. 1619.) As the ALJ noted, Nurse Harrington indicated elsewhere on the same form that sitting, standing, and walking were not affected by Beard's impairment, so her opinion had internal inconsistencies. (Tr. 1618.) Further, his other reasons for omitting Nurse Harrington's recommended sit/stand limitation are also reasonable. As the Commissioner noted, Nurse Harrington is not an "acceptable medical source" under the Social Security Rulings, did not treat Beard, and her opinion is not consistent with treatment records that show Beard's back conditions caused pain but usually did not impair her range of motion, strength, sensation or ambulation.[13]

---

[13] The Commissioner cites to large swaths of the more than 1,100-page medical record in support of this argument - one more than 200 pages in length. This is not in accordance with the Court's Initial Order, which states "a citation to a medical finding contained on a single page of a 20 page Exhibit must cite to the specific page, not generally to the 20 pages of the Exhibit." (Doc. No. 4 at 3.) Nonetheless, it is an accurate statement of

Beard points to other medical records which she claims the ALJ "failed to consider" that generally support the undisputed contention that her back problems constitute a severe impairment.[14] She argues that "[in] his rejection of the sit/stand opinion, the ALJ does not mention the actual x-ray results." (Doc. No. 13 at 22.) However, in step 5 of his analysis, the ALJ addressed the x-ray Beard accuses him of overlooking,[15] "[a]n x-ray of the lumbar spine conducted on October 4, 2016 showed thoracolumbar dextroscoliosis and degenerative changes of the lumbar spine, with some disc narrowing at L3-4, L4-5, and L5-S1 with marginal osteophytes at multiple levels, and some retrolisthesis of L3 with respect to L4 and L4 with respect to L5." (Tr. 30.) He not only mentioned the x-ray results, he also considered them. None of the records Beard cites challenge the ALJ's conclusion that:

> [w]hile examinations have revealed lumbar tenderness and decreased range of motion and occasionally decreased lower extremity strength, sensation and reflexes, examinations have generally confirmed normal joints without swelling or tenderness, normal extremity range of motion, generally full extremity strength, generally normal sensation, consistently normal straight leg raising, normal fine motor coordination, normal lungs and abdomen, and a generally normal gait with consistently independent ambulation.

(Tr. 33.)

It is well-settled that the ALJ may consider the entire record without addressing each of the more than 1,100 pages of the medical record individually. *See, e.g., Conner*, 658 F. App'x at 254

---

contents of the medical record.

[14] These include records documenting her need for and participation in physical therapy, which is undisputed and discussed in the ALJ's opinion. (Tr. 823, 827, 556-57, 702 -05, 559.)

[15] The parties disagree on whether this x-ray was taken October 4, 2016 or October 12, 2016. (Tr. 30, Doc. No. 13 at 21.) However, they describe its findings in nearly identical terms.

("we do not require an ALJ to discuss every piece of evidence in the record to substantiate the ALJ's decision'). Here, the ALJ recognized that Beard's disc displacement of the lumbar spine, retrolisthesis, lumbar facet arthropathy, lumbar radiculopathy, and degenerative disc disease of the lumbar spine" are all "severe impairments," and "significantly limit" Beard's ability to perform basic work activities. (Tr. 23.) He considered the record evidence, and did not ignore or overlook contrary lines of evidence. The ALJ clearly explained his reasoning, and adopted an RFC determination which limited Beard to light work with additional limitations. (Tr. 27.) He considered Nurse Harrington's conclusion that a sit/stand limitation was also necessary, and did not agree. Accordingly, substantial evidence supports the ALJ's rejection of a sit/stand option, it is within the zone of choice, and it must be affirmed.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 1, 2019

31